In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-1047

STANLEY L. FELTON, SR., *et al.*,

*Plaintiffs-Appellants*,

*v.*

STEVEN JOHNSON, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for
the Eastern District of Wisconsin.
No. 2:22-cv-01352 — **Stephen C. Dries**, *Magistrate Judge.*

SUBMITTED SEPTEMBER 11, 2025 — DECIDED JULY 27, 2026

Before BRENNAN, *Chief Judge*, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges*.

JACKSON-AKIWUMI, *Circuit Judge*. Stanley L. Felton worked as a correctional officer for the Wisconsin Department of Corrections (DOC) for nearly two decades before being fired. According to DOC, Felton violated a work rule by alerting his son, G'eas Kalafi, to an upcoming search at the DOC facility where Kalafi was incarcerated. After Felton's termination, both father and son sued DOC. DOC violated their constitu-

tional rights, they assert, by firing Felton in retaliation for his protected speech and by depriving Felton of procedural due process. The district court dismissed Kalafi's claim at screening and granted summary judgment to DOC on Felton's claims. Because the circumstances about which Felton and Kalafi complain do not violate the First or Fourteenth Amendments to the Constitution, we affirm.

**I**

We present the facts below in the light most favorable to Kalafi and Felton as the non-moving parties at the screening and summary judgment stage of the case, respectively. *Balle v. Kennedy*, 73 F.4th 545, 557 (7th Cir. 2023) (screening); *Neita v. City of Chicago*, 148 F.4th 916, 922 (7th Cir. 2025) (summary judgment).

At the heart of this case is a phone call between Kalafi and Felton on December 28, 2019. At the time, Kalafi was incarcerated at the Waupun Correctional Institution, a DOC facility in central Wisconsin. Felton was approaching nineteen years of service as a correctional officer at a DOC facility in Milwaukee.

At the beginning of the half-hour call, Kalafi told Felton that Waupun was on lockdown because an inmate had stabbed a correctional officer. Felton responded: "Yeah I know … They trying—they trying to get somebody to volunteer to come over there and shake down the place. Man, ain't nobody trying to go over there and shake down. I ain't." Felton and Kalafi discussed the lockdown for another minute or two before moving on to other subjects including sports and church.

Two days later, DOC conducted a search for contraband or a "shakedown" at Waupun. An incident report and deposition testimony by DOC Lieutenant Bret Mierzejewski provides DOC's account of what happened. Mierzejewski claims that, during the shakedown, he smelled marijuana in Kalafi's cell but couldn't find any. So he asked Kalafi where the marijuana was. According to Mierzejewski, Kalafi responded by bragging that his father worked at DOC and shared information about the search. Kalafi's account of the shakedown differs. He denies that he told Mierzejewski about the conversation with his father. Instead, Kalafi says, he told Mierzejewski that he anticipated a shakedown because "everybody knows" that DOC conducts a shakedown after an inmate stabs an officer.

DOC placed Felton on administrative leave and notified him that it was investigating him for providing information to an inmate about a search. As part of the investigation, the investigators interviewed Felton, Kalafi, and Mierzejewski and reviewed a recording of the December 28 call. When interviewed, Felton denied sharing anything about the shakedown with his son but acknowledged it was his voice on the call. Felton told the investigators: "You don't realize you've said things until it's too late. As I've said, I had no intent to mention anything about an institution shakedown or lockdown. It was information that shouldn't have come out." In Kalafi's interview, he admitted his father told him about the upcoming shakedown during their conversation about the stabbing at Waupun. Mierzejewski's interview was consistent with his incident report.

The investigators concluded that Felton violated DOC policy by informing Kalafi about the upcoming shakedown.

They also found that Kalafi admitted he told other inmates about the search, though Kalafi claims the investigators fabricated his interview responses to support this finding.

Based on the conclusions from the investigation, DOC fired Felton on February 24, 2020. In the termination letter, DOC informed Felton about his right to appeal through a three-step process codified in Wisconsin state law. Step one required Felton to submit an internal grievance to DOC. If DOC denied the grievance, at step two Felton could appeal to the Wisconsin Department of Administration (DOA). As a step three if DOA decided against him, Felton could appeal DOA's decision to the Wisconsin Employment Relations Commission.

The parties agree Felton never got past the first of these three steps because he sent his initial grievance to DOA instead of DOC. But the parties dispute what happened next.

Felton insists DOA never notified him that he submitted his grievance to the wrong agency. He claims he did not receive any updates about his grievance until he inquired with DOC about the status of his grievance more than two years later and was told there was no record of him having submitted one. For its part, DOC claims that DOA emailed Felton the day after Felton submitted his grievance informing him of his error and telling him to resubmit his grievance to DOC, but that Felton never responded to the email.

In 2022, Felton and Kalafi sued Waupun's warden Steven Johnson, Mierzejewski, and other DOC employees. Their pro se complaint contained two claims relevant on appeal. First, Felton and Kalafi jointly alleged that DOC retaliated against them in violation of the First Amendment by maliciously tam-

pering with their phone call and causing Felton's wrongful termination. Second, Felton alone alleged that DOC violated the Fourteenth Amendment's Due Process Clause by falsifying the record to reflect that Felton informed Kalafi about the shakedown's date and time, which Felton never knew, and then using this false information to terminate Felton. Felton also contended he did not receive adequate process because DOC was biased against him.

The district court dismissed Kalafi's retaliation claim through the screening procedure set forth in the Prison Litigation Reform Act, 28 U.S.C. § 1915A. Two years of discovery then commenced, during which Felton retained counsel. Afterwards, the district court resolved Felton's remaining claims by granting DOC's motion for summary judgment.

In its summary judgment order, the district court held that Felton's First Amendment retaliation claim failed as a matter of law because Felton's statement to Kalafi did not touch on a matter of public concern. Even if it did, the district court reasoned, DOC's interest in keeping searches of its facilities confidential outweighed Felton's interests in the speech. As for Felton's Fourteenth Amendment procedural due process claim, the district court concluded that Felton received adequate pre- and post-termination process, so it ruled in favor of DOC. Felton and Kalafi appeal both this summary judgment decision and the earlier dismissal order.

## II

We conduct de novo review of the district court's grant of summary judgment to DOC on Felton's claims. *Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 844 (7th Cir. 2025). Summary judgment is proper if "the movant shows that there is no gen-

uine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A. First Amendment Retaliation

We start with Felton's First Amendment retaliation claim. A public employee can make out a First Amendment retaliation claim if the employee: (1) "engaged in constitutionally protected speech"; (2) "suffered a deprivation of a type that is likely to deter protected speech"; and (3) that speech "was a motivating factor in the deprivation." *Darlingh v. Maddaleni*, 142 F.4th 558, 564 (7th Cir. 2025); *see Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Our discussion of Felton's claim begins and ends with the first element, because Felton's comment was not constitutionally protected as a matter of law.

To merit constitutional protection in the First Amendment retaliation context, a public employee's speech must touch on "a matter of public concern." *Garcetti*, 547 U.S. at 418. A matter of public concern means any speech "relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citation omitted). This includes speech of "legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* (citation omitted). Examples of matters of public concern include sworn testimony about a public corruption scandal, *see Lane v. Franks*, 573 U.S. 228, 231–33 (2014), or a speech at a political rally about a hot-button social issue. *See Darlingh*, 142 F.4th at 560–61.

On the flip side, speech is not protected if it involves only "matters of purely private concern." *Snyder*, 562 U.S. at 454 (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985)). Relevant here, we have held that "speech

that concerns personal job-related matters" is not of public concern. *Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019).

In determining whether speech is of public concern, "we consider the content, form, and context" of the speech. *Kilborn v. Amiridis*, 131 F.4th 550, 559 (7th Cir. 2025) (citation omitted). Content is the "most important factor." *Id.* But "no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech[.]" *Snyder*, 562 U.S. at 454.

Taken together, the content, form, and context of the statement show that it was private, not public. The statement—that DOC "was trying to get somebody to come over [to Waupun] and shake down the place. Man, ain't nobody trying to go over there and shake down. I ain't"—merely conveys Felton's personal frustration at the potential inconvenience of having to participate in the shakedown. It does not "relat[e] to any matter of political, social, or other concern" or "general interest" to the public. *Id.* at 453 (citations omitted). Felton also made the statement in the purely private situation of a one-on-one conversation with his son, not in a public or even semi-public setting. Considering all the circumstances, Felton's statement was not a matter of public concern.

Arguing otherwise, Felton asserts that his conversation as a whole should be protected because he and Kalafi touched on political and social issues throughout the call. As examples, Felton points to their discussion about inmate safety, excessive force, and the lack of racial diversity among correctional officers at Waupun, all topics not directly related to the shakedown. Felton claims that, because some parts of the call touched on matters of public concern, the entire call—including his statement about the shakedown—is protected, too.

Felton's position that all statements within a conversation spanning multiple topics automatically receive First Amendment protection just because some of the topics are of public concern finds no support in our caselaw. DOC did not fire Felton for his statements on inmate safety and racial diversity at prisons. Instead, the record shows DOC fired him for disclosing the upcoming shakedown, which did not touch on a matter of public concern.

Felton also contends that the phone call touched on matters of public concern because DOC policy "encourage[s] communication between an inmate and [their] family, friends, government officials, courts, and people concerned with the welfare of the inmate." Wis. Admin. Code § 309.39 (2026). Felton's argument here is not entirely clear. But even if DOC policy encourages communication on prison phones, it does not follow that the First Amendment protects every statement that public employees make on prison phone calls.

Summary judgment was therefore proper on Felton's First Amendment retaliation claim.

## B.  Procedural Due Process

Next we consider Felton's procedural due process claim. The Due Process Clause of the Fourteenth Amendment "imposes procedural limitations on a State's power to take away protected entitlements." *Dist. Atty's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 67 (2009). "In order to demonstrate a violation of procedural due process, a plaintiff must establish (1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) the failure to employ constitutionally adequate procedures." *Gal-*

*van v. Indiana*, 117 F.4th 935, 948 (7th Cir. 2024) (citation omitted).

No one disputes that Felton, as a public employee, had a property interest in his continued employment. *Vargas v. Cook Cnty. Sheriff's Merit Bd.*, 952 F.3d 871, 874 (7th Cir. 2020). Nor do the parties disagree that DOC deprived Felton of that interest by firing him. So the question is whether the process Felton received before and after his termination was constitutionally adequate. We agree with the district court that it was.

### 1. Pre-Termination Process

We start with the process Felton received before he was terminated. In practice, a public employer satisfies the constitutional requirements of pre-termination process if it "makes the employee aware of the charges he is facing and provides him an adequate opportunity to respond to those charges before he is terminated." *Galvan*, 117 F.4th at 948–49 (citing *Snowden v. Ill. Dep't of Hum. Servs.*, 75 F.4th 789, 795 (7th Cir. 2023)). The purpose of this pre-termination process is limited where, as here, post-termination process is available to challenge an employee's termination. In these cases, "the purpose of a pre-termination hearing is not to definitively resolve whether discharge is appropriate, but rather to serve as 'an initial check against mistaken decisions….'" *Snowden*, 75 F.4th at 794 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545–46 (1985)).

Felton's pre-termination process satisfied these requirements. As Felton himself acknowledged before the district court, DOC "provided [him] with a pre-disciplinary meeting date, time, notice of charges, allegations against him and informed [him] of how his limited defense could be presented."

The record backs up Felton's admissions. There is no dispute that DOC provided him with written notice of the specific conduct with which he was charged. DOC's notice informed Felton that he was "alleged to have violated" DOC rules by "provid[ing] information regarding a planned search at Waupun … to an inmate at [Waupun] on December 28, 2019."

That notice also instructed Felton to appear at a "pre-disciplinary meeting." At the meeting, the investigators interviewed Felton and gave him a chance to tell his side of the story. This included an opportunity to refute the recorded call, which was the primary evidence against him. On these facts, Felton received both notice and an adequate opportunity to respond to the allegations against him, which satisfies the Constitution's guarantee of pre-termination process.

## 2. Post-Termination Process

DOC also provided adequate process to Felton after his termination. An adequate post-termination remedy "is one that is promptly able to restore the employee to her post." *Calderone v. City of Chicago*, 979 F.3d 1156, 1166 (7th Cir. 2019). Here, DOC made available to Felton a lengthy appeals process, which involved three layers of review by state agencies. "Such procedures can (and typically do) satisfy the requirements of post-deprivation due process." *Id.* (citation omitted); *see also Loudermill*, 470 U.S. at 547–48 (holding that Ohio's similar post-termination administrative procedures satisfied due process where "coupled with" pre-termination notice and opportunity to respond).

Although Felton never made it past the first step of the grievance process because he did not file a grievance with DOC, the test is whether adequate process was *available*, not

whether Felton took advantage of it. We have held that an employee "cannot refuse to pursue the available state remedies and then come into federal court complaining that he was not afforded due process." *Cleven v. Soglin*, 903 F.3d 614, 617 (7th Cir. 2018) (citation omitted).

That principle forecloses Felton's post-termination process claim. In arguing that DOC did not make its appeals process available, Felton leans on his assertion that DOC never notified him of his submission error. DOC disagrees. But we need not decide whose version of events to believe. Even assuming DOC never sent Felton an email, Felton does not explain why he waited more than two years to follow up on his initial grievance.

To be sure, we do not demand perfect compliance from employees faced with administrative appeals processes. *Cf. Tucker v. City of Chicago*, 907 F.3d 487, 492 (7th Cir. 2018) (rejecting proposition that a procedural due process claim requires exhaustion of remedies). But on these facts, Felton cannot say DOC denied him the proper post-termination process. *See Cleven*, 903 F.3d at 617 (affirming summary judgment for state where plaintiff argued post-termination remedies were insufficient but "d[id] not say why … he let two years go by before he took advantage of th[e] procedure"); *Tucker*, 907 F.3d at 492 ("The due process clause does not permit a litigant to disdain his opportunities under state law and then demand that the federal judiciary supply a remedy." (quoting *Simmons v. Gillespie*, 712 F.3d 1041, 1044 (7th Cir. 2013))).

### 3. Bias

Felton also argues that the process he received was constitutionally deficient because the entire proceeding was tainted

with bias against him. Of course, a biased adjudicator cannot provide constitutionally adequate process. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 537–38 (2004). But we indulge a "presumption of honesty and integrity in those serving as adjudicators." *Schneiter v. Carr*, 148 F.4th 438, 450 (7th Cir. 2025) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Thus, to defeat summary judgment on a bias claim, a plaintiff must proffer a "specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable." *Id.* (citation omitted). On this record, Felton has not provided this foundation.

As with Felton's retaliation claim, we affirm the district court's grant of summary judgment on Felton's procedural due process claim.

### III

Our final matter for review is the district court's dismissal of Kalafi's claim at screening. Before diving in, we note that the district court did not enter a partial final judgment on Kalafi's claim when it dismissed it, *see* Fed. R. Civ. P. 54(b), nor did it mention Kalafi or his claim in its final judgment order. Our jurisdiction depends on the district court entering final judgment on "all claims of all parties." *Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792, 795 (7th Cir. 2018) (citing 28 U.S.C. § 1291). But we have discretion to exercise jurisdiction here because "it is clear that the district court believes it has finished its work on the case." *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1020 (7th Cir. 2013).

Moving to the merits of the dismissal, we review the district court's decision de novo, taking all factual allegations as true and granting Kalafi all reasonable inferences from those

allegations. *Balle*, 73 F.4th at 557. Because Kalafi filed his complaint pro se, we construe it liberally, "holding it to a less stringent standard than formal pleadings drafted by lawyers." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citation omitted).

Viewing Kalafi's filings, including his brief on appeal, under this charitable lens, we can sketch the following outline of a First Amendment claim: (1) Kalafi's conversation with his father was protected speech; (2) his father's termination was a deprivation "that would likely deter" Kalafi from further conversations with his father; and (3) his father's termination was motivated in part by Kalafi's protected speech.

Even liberally construing Kalafi's pleadings, his claim falls far short, for two reasons. First, as noted above, the statement for which DOC fired Felton was not protected speech as a matter of law. And second, Kalafi does not explain why DOC's termination of his *father* constitutes a deprivation that gives rise to a constitutional claim *by Kalafi*. *Cf. Powers v. Ohio*, 499 U.S. 400, 410–11 (1991) (explaining the circumstances in which a plaintiff may bring a claim for a violation of a third party's constitutional rights). We therefore affirm the district court's dismissal of Kalafi's complaint at screening.

## IV

Felton's termination did not violate his or Kalafi's rights under the Constitution. The decisions of the district court are therefore

AFFIRMED.